JAMES *v.* BOWMAN.

5-2012                                331 S. W. 2d 866

Opinion delivered February 8, 1960.

[Rehearing denied March 7, 1960]

*W. B. Putman* and *Shaw, Jones & Shaw,* for appellant.

*Rex W. Perkins* and *James R. Hale,* for appellee.

J. Seaborn Holt, Associate Justice. Appellant, Johnnie James, brings this appeal from a judgment on a jury verdict in favor of appellee, Roy Bowman for $17,000.00. In his complaint, Bowman alleged that he was severely injured from an electric shock caused by the negligence of James in operating a crane so as to cause its cable to come in contact with a high power electric wire which carried 7,200 volts. James answered with a general denial and specifically pleaded assumption of risk and contributory negligence of Bowman such as to constitute a complete bar to any recovery.

For reversal James says, in effect, that the trial court erred, (a) in denying his request for an instructed verdict at the close of all the testimony, (b) in giving instruction 15 as follows: ''Before any recovery can be had for permanent injury, or any future pain or suffering connected therewith, it must appear with reasonable certainty that the injuries are permanent and that future pain and suffering is inevitable. Where future pain or suffering appear to be only probable or uncertain, recovery cannot be given therefor. * * *'', (c) that the verdict was excessive and (d) that the court erred in ''permitting appellee's counsel to make certain remarks in his closing argument.''

## (a and b)

The testimony shows that at the time Bowman received his injury he was employed by Tyson Feed and Hatchery Company at Springdale, Arkansas as an elec-

tric welder. He had had some twelve years experience as such welder and at the time of his injury, he (Bowman) was assisting another Tyson employee, Graves, in handling and installing some 8 by 12 feet steel panels in constructing a feed bin. James was an independent contractor and owned and operated a crane equipped with a boom and wire cable. Tyson Feed and Hatchery Company was engaged in constructing a metal feed bin on the east side of a building located adjacent to an alley which was 45 feet wide and running north and south. Tyson also owned a warehouse building directly across the alley to the east. Running parallel to the warehouse and at a height of 32 feet 5 inches from the ground and from four to six feet from the eave of the warehouse building, was the electric wire in question. The steel panels used in constructing the feed bin were stacked alongside the warehouse building on the east side of the alley.

Tyson Feed Company had engaged James to bring his crane and hoist the metal panels, carry them one at a time as needed from the east side of the alley to the side of the building on the west side thereof and up to a point where they were to be installed on the feed bin. James determined where his crane would be located, how it would be operated and had sole control and operation of it. The crew engaged in construction of the feed bin consisted of the independent contractor, James (appellant), Bowman, Mr. Graves, Robert Bowers, and Dick Kendrick. As indicated, it was James duty to hoist the steel panels and in order to do this, he had stationed his crane 12 to 15 feet west of the wall of the warehouse building. The crane was equipped with a moving boom extending 47 feet and 3 inches above the ground. The crane was equipped with a cable which was used in hoisting the material. There was a hook on the lower end of the cable from which was attached two short lengths of cable to be attached to the panels to move them. Before attaching the cable to the panels, they were moved outward from the warehouse building and laid in the alley. Kendrick took no part in this part of the work but remained up on the side of the building

where the feed bin was being constructed. Bowers assisted in installing the panels on the feed bin. On the day that appellee received his injury, and Graves was killed, the crew had moved and installed two or three panels and Bowers was up on the side of the feed bin. James, Bowers and the other three employees all knew and realized the dangerous situation confronting them. James testified: "I knew — he told me what he wanted to do and I knew the condition over there. I knew there was a power line over there. * * * So I moved on over to the location and I saw the conditions there and I parked my machine and I got out and I said, 'Boys, we've got a dangerous condition here.'"

It is undisputed that the cable attached to the crane came in contact with the electric wire above mentioned while Bowman and Graves were attaching the cable wires to one of the 8 by 12 feet panels, and the electric shock killed Graves instantly and severely injured Bowman. The cable had contacted the power line 32 feet and 5 inches above the ground, or about 14 feet and 10 inches below the boom. As to the location of the metal panels to which Bowman and Graves were attaching the wire cable, Bowman testified: "Well, we come down to pick up the third or fourth piece of metal which was leaning up against the building on the east side, me and Mr. Graves, him at one corner and me at the other. We picked a piece of metal up and laid it down. At the same time we laid it down, we pulled it out about two or three foot, like we'd been doing. We got our cable and walked over and was hunkered down, both of us, bolting angle irons to the corner of the section of metal that we was picking up. The first thing I knew, I was froze. I couldn't move. Couldn't move a finger. Next thing I knew, I was laying on the piece of metal and it was burning my arm, which I have a scar, and it burnt me across my back, and I rolled off the piece of metal I was laying on to get free from the electricity. * * * Q. Did you ever, at any time, pull that cable into the highline? A. No, sir."

James testified that he depended upon Bowers who was to signal him when to move the boom or crane. He testified: "Q. From your position on the crane, Mr. James, could you keep these people in view in the process of attaching this sling? A. Yes, I could keep them in view, had I been watching. But after I swung back and put my machine in position, my work was done until I had a signal to lift away. * * * Q. In other words, you didn't pay any attention to Bowman and Graves. A. No. Q. To see whether they were ready, or not? A. No. Q. Or to see where the cable was? A. That's right." James further testified that immediately after he saw that Graves and Bowman had received a shock, "Immediately, I just reached back and I started out of the door, I remember, I hit the throttle, and shut the machine off and then I jumped off the machine."

Our rule is well established that in testing the sufficiency of the evidence to support the verdict of a jury, we must view the evidence, with every reasonable inference arising therefrom, in the light most favorable to the appellee. *Missouri Pacific Transportation Co.* v. *Jones,* 197 Ark. 79, 122 S. W. 2d 613. We hold that there was substantial evidence to support the jury's verdict and the judgment rendered thereon. It appears undisputed that someone was negligent in this case and it was the province of the jury to say whose negligence was the approximate cause of Bowman's injury. After hearing the evidence and viewing the premises, the jury composed of twelve representative citizens, unanimously held appellant, who had absolute control of the crane and its movements, to be the negligent party. Under the testimony, as we view it, the jury could, and evidently did, find that while Bowman and Graves were attaching the short wires to the metal panel, appellant, James, moved the boom in an easterly direction, causing the cable to contact the power line, which resulted in the instantaneous death of Graves and severe injuries to Bowman.

## (c)

We do not agree that the verdict was excessive and unsupported by substantial evidence. Bowman was 37 years of age and had followed the trade of "welder" for twelve years. He was earning $80.00 to $85.00 per week before his injury, and has suffered a loss of $20.00 per week in wages, or approximately $1,000.00 a year in salary, since his injury. He was in fine health before the injury but after he was injured, he testified, "got so nervous I just couldn't stay around the electric welding. The electric welding sounded just like it did whenever the accident happened." He has been forced to give up welding and has gone to truck driving. Following his injury he was treated for more than two months by his family doctor and then admitted to the Veterans Hospital where he remained for seven weeks, receiving little or no benefit therefrom. He has developed heart trouble since the injury, his eyes were permanently injured and certain functions of his brain impaired by the electric shock. We have no definite yardstick with which to measure damages. In the recent case of *Williamson* v. *Garrigus*, 228 Ark. 705, 310 S. W. 2d 8, we said: "In cases of this nature we are afforded no definite yardstick by which to measure damages and the amount awarded must, therefore, be left to the sound discretion and judgment of the jury, or the court sitting as a jury, based upon the evidence in the case. The amount so awarded cannot be disturbed by this court as excessive if we find any substantial evidence to support it." See also *Rudolph* v. *Mundy*, 226 Ark. 95, 288 S. W. 2d 602.

## (d)

Appellant next contends that the court erred in permitting appellee's counsel to use the following language in his closing argument: "I'm telling you when they knew death was hovering over and above them, that if a line touched that line, and they put that drag line into a position where it could touch that highline, I'm telling you that that's negligence. And you know it." The court, in answer to objection to this statement, stated:

"You can comment on my instructions." Trial courts have some discretion in allowing statements of counsel in closing arguments. We find no abuse of such discretion here. It appears to us that counsel was only arguing what would constitute a failure of appellant, James, to use ordinary care as had been clearly defined by the court in one of its instructions in which this language was used: "a. Negligence is the failure to use ordinary care, and ordinary care is that degree of care which is used by ordinary persons under the same or similar circumstances."

We have carefully considered other alleged errors and find them to be without merit. Accordingly, the judgment is affirmed.